Littleton, Judge,
delivered the opinion of the court:
Plaintiff has brought this suit to recover sums alleged to be due it under a contract with defendant acting through the Army Signal Corps. Defendant has counterclaimed for amounts alleged to be due it under the same contract.
In 1950 the Army Signal Corps was interested in obtaining a high production of a new type of telephone cable it had designed and which was of value in the Korean War then in progress. The new cable, known as “spiral-four cable”, could carry twelve simultaneous conversations, whereas the type previously used had a capacity of only one conversation in each direction. Contracts for the production and supply of this new cable were entered into by the Signal Corps with sis of the major cable producers in the country.
One of the components of the outside covering of the new cable was a woven or braided mesh of stainless steel, nonmagnetic wire .015 in diameter. This wire was not produced *690 by the six companies holding prime contracts with the Army, but was in turn obtained by them from subcontractors.
Plaintiff interested itself in producing the .015 steel wire, and by October 1951 had obtained five purchase order subcontracts to produce the wire for cable companies with prime contracts with the Army.
In support of the efforts of the prime contractors to acquire this part of the cable-covering the Army, after making a survey in the industry, entered into what are known as “special facilities contracts” with subcontractors and those who desired to obtain such subcontracts.
A special facilities contract is a contract with the Government wherein equipment and machinery is bought and installed in a plant of a contractor to increase its productive capacity. The machinery is ordered, installed and paid for in the first instance by the contractor. When it has been inspected and approved by the agency and when actual payment by the contractor has been established, the contractor is reimbursed. When the equipment and machinery has been paid for by the Government by way of reimbursement, title to the same passes to and remains in the Government. The equipment and machinery are to be used in connection with the Government work of the particular agency involved and cannot be used for other Government work or for commercial work, unless there is express written authority to do so.
Following its acquisition of the subcontracts, plaintiff began negotiations with the Army relative to acquiring a special facilities contract. The Army raised two questions with respect to plaintiff’s capabilities to produce the wire. The first was the matter of plaintiff’s plant which the Army found too small, and the second, concerned plaintiff’s financial condition. Plaintiff had applied to the Eeconstruction Finance Corporation for a loan, and the EFC, after being assured that a special facilities contract would be given to plaintiff if the loan could be secured, granted a loan in the sum of $75,000. Plaintiff thereupon purchased a new plant, which the Army had recommended as being satisfactory, and vacated its old one. A later loan of $150,000 was secured from the EFC for use as working capital. The first loan was secured by a mortgage on the real estate and the other by *691 a mortgage on plaintiff’s equipment, machinery and other personal property.
On February 11,1952, plaintiff and defendant entered into a contract entitled “Special Facilities Contract” under which certain facilities in the total value of $98,753.92 were to be installed in plaintiff’s plant for use in producing the .015 steel wire. By supplemental agreement this amount was later raised to $100,504.19. Plaintiff was one of ten companies to be awarded a special facilities contract with respect to the production of the spiral-four cable.
Plaintiff’s experience in producing the wire with which it had had no prior experience was not very successful. In the spring of 1952, despite the availability of raw materials and labor, plaintiff could not meet the delivery dates and quality requirements contained in its subcontracts because of manufacturing difficulties. Although plaintiff by means of trial and error, overcame such manufacturing difficulties and produced wire which met the necessary standards, it never was able to fulfill all its orders for the wire, even during the latter period of its production when the spiral-four cable program was cut back because of the turn of events in the Korean War. Production of 75,000 pounds per month was estimated as needed in order for plaintiff to meet its obligations to the RFC. It never approached that capacity, and despite the RFC loans and the installation of the Government-owned equipment, plaintiff lacked sufficient credit and necessary equipment. The Army subsequently granted plaintiff permission to use the installed machinery and equipment to do commercial as well as other Government work, but by mid-1953 plaintiff’s plant was idle because of lack of working funds, although it had a backlog of both Government and commercial orders.
On July 15, 1953, the Army terminated the special facilities contract, and plaintiff was eventually petitioned into bankruptcy by its creditors. After establishing title thereto, the Army removed its machinery and equipment from plaintiff’s plant. This suit has been brought by plaintiff in its own name with the knowledge, acquiescence and approval of the trustee in bankruptcy, for the benefit of its creditors and for its own benefit.
*692 After the facilities called for under the contract were installed, plaintiff submitted vouchers to defendant totalling $102,806.78. Of this amount, plaintiff was paid only $94,184.24 leaving unpaid on such vouchers the amount of $8,622.54. Plaintiff claims that it is entitled to be paid some $27,709.04 for equipment and machinery although its actual recorded expenditures, not all of which are supported by vouchers, totaled only $109,765.82. If such expenditures were incurred in the amount recorded on its books, this would leave a difference of only $15,581.08 between the recorded expenditure of $109,765.82 and the $94,184.24 already received by plaintiff, and not the $27,709.04 claimed. In addition to the $94,184.08 already paid to plaintiff, the record establishes that only $9,542 was actually paid out by plaintiff and not reimbursed by defendant, and of that amount only $8,622.54 was covered by vouchers submitted to the Army.
The Government admits that there is due and owing to plaintiff $5,377.08 of the above $8,622.54. Defendant denies liability for the remaining $3,245.46 on the grounds that as to part of the amount plaintiff has failed to show actual payment to suppliers, and as to the other part of the amount plaintiff failed to render proper billing. For reasons which will be explained hereinafter in connection with our discussion of item one of defendant’s counterclaim, we hold that plaintiff is entitled to recover the $3,245.46 as well as the $5,377.08 which defendant admits is due and owing plaintiff.
Under the first item of its counterclaim, defendant says that there is due the Government by plaintiff the sum of $12,818.55 which sum was paid to plaintiff by way of reimbursement on vouchers 1-8 inclusive, in connection with the installation of machinery and equipment. This $12,818.55 is composed of costs the payment of which was later disapproved in the amount of $4,372.20 and was suspended in the amount of $8,446.35, as the result of a reaudit by the Government. In addition, the Army paid nothing to plaintiff on its vouchers 10, 11 and 12 totalling $5,123.80, having suspended payment thereon to the extent of $3,015.95 and having disapproved payment of $229.51, leaving a balance of $1,878.34 which defendant now admits is due to the plaintiff. The $1,878.34 is included in the $5,377.08 discussed *693 earlier herein which, total sum defendant admits is due plaintiff. What items go to make up the remainder of the $5,377.08 admittedly due plaintiff is not shown.
The items for which payment was disapproved, i. e., $4,372.20 and $229.51, were so treated because plaintiff had failed to show actual payment, while the items for which payment was suspended by defendant, i. e., $8,446.35 and $3,015.95, were so treated because the items were incorrectly billed.
The machinery and equipment in connection with which the above mentioned suspensions and disapprovals were made, were obtained by plaintiff, installed in the plant and were utilized in the production of the .015 wire under plaintiff’s subcontracts. But for the failure of plaintiff to establish actual payment as to some of this machinery and equipment, and its improper billing procedures as to others, plaintiff would have been deemed by the Government to be entitled to be reimbursed for these items. In addition, since the equipment and machinery were required by the contract and were installed and used in plaintiff’s plant, defendant, based on the record in this case, must have gained possession of that equipment and machinery when it repossessed the contract facilities upon the termination of plaintiff’s contract. An inventory of the equipment and machinery was made by defendant, and a claim with respect to certain items actually found not to have been present upon repossession, is included as item two of defendant’s counterclaim and will be discussed hereinafter. Also, with respect to those items for which reimbursement was not made because of improper billing, there is no showing that plaintiff could have purchased the equipment at a lesser cost than it did or that plaintiff paid other than a fair and reasonable price.
In view of the above circumstances, we are of the opinion that defendant is not entitled to recover on item one of its counterclaim. Conversely, plaintiff is entitled to recover the $3,245.46 still due and unpaid on its vouchers 10,11, and 12. This amount, added to the $5,377.08 which defendant admits is due to plaintiff, totals $8,622.54 due plaintiff as reimbursement for costs incurred in the purchase of the contract facilities.
*694 Plaintiff also claims additional amounts for overhead and direct labor costs with respect to the installation of the equipment and machinery. It contends that the manner in which overhead was to be computed was never agreed upon by the parties, and that there remains due overhead costs in the sum of $12,331.06 (voucher 9). Although requested to do so, plaintiff never submitted to the Army, the required accounting statements in support of this amount. In addition, an audit of plaintiff’s books and records affords no basis for the determination of the alleged overhead expenses now claimed. Plaintiff is also in error in contending that no consideration was given to such a cost at the time the contract was made. The Army on February 1, 1952, prior to the execution of the contract on February 11, had prepared a price analysis which contained an estimate for costs likely to be incurred in connection with the installation of the facilities in the amount of $1,440. In view of the small amount involved it was decided to include it as a direct charge, and it was so included in the contract as executed.
Plaintiff lists a claim for unpaid wages in the amount of $6,202.62. While unpaid wages in the amount of $6,101.04 are verified, the evidence fails to establish what part, if any, was for direct labor required for the installation, nor does it show application to or approval by the contracting officer. Plaintiff’s auditor testified that the wages were not all for installation but made no attempt to allocate them. The Army estimate of $1,873 for direct labor was included in the contract and paid. Plaintiff is not entitled to recover on these claims.
The remainder of plaintiff’s claim is composed of additional items of costs and damages which it contends are due it under the theory that the subject contract was, apart from the provisions relating to the installation of equipment and machinery, a supply contract under which the Government was obligated to insure plaintiff sufficient orders of the .015 wire so that plaintiff’s obligation to the KFC could be met.
In support of this theory of recovery, plaintiff points to the reference in the contract to
Maximum production attained — 1 May 1952 at a maximum rate of 75,000 lbs. per month
*695 and to the following clauses which appeared in the contract:
wheReas, there is in existence at this time certain executed supply contract (s) between the Government and the Contractor; and
whereas, the successful performance of said contract (s) requires the utilization of Government property and facilities; and
whereas, it is deemed by the Department of the Army that the furnishing of said equipment and facilities* itemized in the schedule or schedules attached hereto and amendments thereof, will facilitate performance of said supply contracts and will aid the national defense; * * *
The reference to the 75,000 lbs. per month was merely the maximum amount of production which could be expected with the use of the installed facilities called for under the contract.
The contract was prepared on a mimeographed form and it has been found by the trial commissioner, which finding is amply supported by the record, that the above-quoted language is not pertinent and should have been stricken. The executed supply contract (s) referred to in the above-quoted provision were not with this plaintiff. Plaintiff had supply contracts for the production of .015 wire, but they were all with cable companies who had prime contracts with the Army to produce and supply the spiral-four cable which required the use of this wire. The Army had no use for the .015 wire as an end product and never contracted with any company to supply it.
The record establishes that neither party intended the subject contract to be a supply contract either at the time of the execution of the contract or at any time during plaintiff’s operations under the contract. Its sole purpose was to enable plaintiff to increase its productive capacity so that it could supply wire in sufficient quantities under the supply contracts it did have with private cable companies having prime contracts with the Army.
In addition, the record made with respect to the many items of reimbursable costs and damages which plaintiff alleges is due it under the supply contract theory furnishes no basis for recovery by plaintiff for those items. The trial commissioner has found that plaintiff as a matter of proof has failed *696 to substantiate its allegations with, respect to these items. They are all found to be either unrelated to plaintiff’s production of the .015 wire or not supported by accounting data. These claims are all treated in detail in findings 18-24,30-32, and 35.
We now turn to the remaining items of defendant’s counterclaim, having discussed and denied the first item thereof above.
In item two of its counterclaim defendant asserts that the sum of $2,907.03 is due it for certain items of installed equipment which were not in the plant when the Army removed the facilities. This amount has been found to be the fair market value of the missing equipment and defendant is entitled to recover that amount.
Item three of the counterclaim is a claim for $6,695 for damage to the machinery and equipment found to be beyond normal wear and tear (finding 39). This damage occurred during the period of approximately six months which elapsed between the time plaintiff ceased operations and the date the Army took possession of the equipment and machinery, and was due principally to the failure of plaintiff to properly store and care for the idle facilities. Plaintiff had been ordered by the trustee in bankruptcy to bear the expense of the maintenance of the plant and machinery and directed to deposit $600 toward defraying this expense, but plaintiff failed to do so. The $6,695 estimate is found to be a reasonable one and defendant is entitled to recover this amount.
As item four of its counterclaim, defendant claims $4,043 as the amount paid for maintaining guards at plaintiff’s plant during the period of time between the termination of the contract and the removal of the Government-owned facilities. While under the contract such a cost was one, which, if incurred by plaintiff, would have been reimbursed, the delay in removing the equipment and the consequent necessity for providing the protection-service was occasioned by plaintiff. The Army had sought to remove the equipment immediately upon termination of the contract but plaintiff, by steps taken in the bankruptcy proceedings, prevented the removal for several months. Having chosen to do so, plain *697 tiff must be held to be liable for the cost of whatever reasonable steps were necessary to safeguard the Government equipment in the idle plant. The fair value of the Army’s share of this cost, which it shared with the RFC, is found to be $4,043 and defendant is entitled to recover that sum.
In its brief the defendant has asked leave to amend its counterclaim to include an additional item representing Federal employer withholding taxes and Federal old age benefit taxes, together with interest and penalties thereon, which defendant asserts are due to the United States from plaintiff in connection with the performance of the contract in suit and which have not been paid. The plaintiff in turn has claimed in its petition that under its contract it was entitled to be reimbursed by the Government for such taxes. We have been unable to find any provision in the contract which provides for the reimbursement of such taxes to the plaintiff. In urging that the taxes are a reimbursable item under the contract, plaintiff, of necessity, relies on its supply contract theory and alleges that the failure of the Government to allocate shipments of the wire relieve the plaintiff of the necessity of paying the tax. In view of our holding that the contract was a special facilities contract and not a supply contract, it follows that there is no merit to this contention of the plaintiff.
While we do not favor defendant’s method of moving in its brief for leave to amend its counterclaim rather than proceeding by motion filed during the trial stage or after the filing of the trial commissioner’s report, its request to amend its counterclaim is granted under Rule 18 (b) of the Court. We are unable, however, to render judgment for the defendant on this item of its counterclaim in the present state of the record. The sum of $34,816.49 claimed by defendant includes not only the principal amount of the Federal taxes due but also penalties and interest on such taxes and the record does not indicate how much of that total sum represents principal and how much represents penalties and interest. We have held that plaintiff is entitled to recover from the Government certain amounts which were due to it under its contract and upon which amounts no interest is, of course, allowable. Accordingly, we can allow no interest *698 or penalties in favor of the Government on taxes dne to the United States by the plaintiff if those taxes accrued during the period when the Government owed the plaintiff the amounts now found to be due plaintiff under the contract in suit. Furthermore, the record does not reveal whether any assessment or demand of the taxes in question were made on the plaintiff and, if so, the dates of such assessment and demand. American Propeller Co. v. United States, 300 U. S. 475.
In summary, we conclude that plaintiff is entitled to recover from the United States the sum of $8,622.54, and that defendant is entitled to recover of the plaintiff $13,645.03. However, we are unable to make a final determination as to the amount of the judgment for the defendant until further proceedings are held pursuant to Kule 38 (c). During such further proceedings the defendant will have an opportunity to furnish the court with a statement concerning the principal amount of the taxes due in connection with the contract in suit, the fact of whether or not assessment and demand were made upon the plaintiff, and, if so, the dates of such assessment and demand.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and Jones, Ohief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Trial Commissioner Marion T. Bennett, makes the following findings of fact:
1. In late 1950 the Army Signal Corps was interested in obtaining high production of a new type of telephone cable it had designed and which would be valuable for use in the Korean War then in progress. The new product known as “spiral-four cable” could carry twelve simultaneous conversations whereas the type previously used had a capacity of only one conversation in each direction. Contracts for the production and supply of the new cable were entered into between the Signal Corps and six of the major cable producers in the United States — General Cable Corpora *699 tion, Western Electric Company, Eome Cable Corporation, Anaconda Wire and Cable Corporation, United States Rubber Company and Simplex Wire and Cable Company.
2. The central part of the spiral-four cable was made up of four copper conductors coated with plastic. They were cored and spiraled (from which the cable is named) and protected by another plastic coating. Outside of this was a carbon impregnated tape and the next layer was a woven or braided mesh of stainless steel, nonmagnetic wire .015 in diameter. The wire mesh was valuable to protect the cable from abuse under field conditions. The mesh was coated with a final protective sheath of plastic. This case concerns the .015 stainless steel nonmagnetic wire which was a component part of the spiral-four cable. The six companies with which the Signal Corps had prime supply contracts obtained the .015 steel wire from subcontractors. Because greater productive capacity was needed to supply this vital part of the cable to prime contractors the Signal Corps entered into “special facilities contracts” with subcontractors and those who desired to obtain such subcontracts. Plaintiff’s special facilities contract in issue here was the last of ten such contracts negotiated by the Signal Corps up to 1952 and involving total expenditures of approximately five and one-half million dollars.
3. The award of special facilities contracts was preceded by a survey by the Signal Corps in late 1950 and early 1951 to determine what companies were producing or could produce the .015 wire and what companies would require special facilities contracts to expand their capacity to produce it. Twenty-eight wire companies were contacted, including plaintiff. Plaintiff, a Massachusetts corporation, was one of seventeen qualified by experience, ten getting contracts as noted above. Plaintiff had its own plant, facilities, machinery and equipment and was in the business of manufacturing wire although it had not made any of the kind in issue here. On February 1, 1952, plaintiff had current assets of $36,464.33, liabilities of $33,003.15 and working capital of only $3,461.18. However, plaintiff’s president, when told by the Signal Corps about the new program and of the six prime contractors who would be interested in buying *700 .015 stainless steel nonmagnetic wire, was enthusiastic about the ability of his company to manufacture the component in question. Plaintiff did, in fact, by October 1951 obtain purchase order subcontracts to produce this wire in the amounts shown for the following cable companies which had prime contracts with the Army as listed below:
Prime contractor Unit of Government prime contract No. Amount of subcontract
Anaconda Wire <& Cable Co., Hastings-on-Hudson, New York, Order G-17707. U. S. Army.. DA-36-039-SC-4917 $189,000
Rome Cable Corp., Rome, New York, Order 10516. U. S. Army.. D A-36-039-S C-4919 105,000
Bergen Wire Rope Co., Lodi, New Jersey, Order 5168. U. S. Navy.. NOBS-53779 264,000
Anaconda Wire & Cable Co., Hastings-on-Hudson, New York, Order G-18498. U. S. Army.. D A-36-039-S C-4917 79,000
Western Electric Co., Point Breeze Works, Baltimore, Md. U. S. Army.. D A-36-039-S C-4922 11,000
In addition, in October 1951 plaintiff had been requested to accept additional orders from Rome Cable and Anaconda, and new orders from General Cable and United States Rubber.
By the time the contract was entered into, the plaintiff had orders on its books for 600,000 pounds of .015 wire, which at 75,000 pounds per month was an eight months’ backlog. The rfc had been given this information which was one influential factor in granting plaintiff the loans described in the next finding.
4. Signal Corps representatives examined plaintiff’s plant at Worcester, Massachusetts. It was recommended that plaintiff use a larger plant available in Worcester at 41 Sutton Lane. However, the Signal Corps felt that plaintiff’s financial condition did not justify giving plaintiff a special facilities contract and placing Government facilities in plaintiff’s plant unless it was assured that plaintiff could get financing from some source. Plaintiff had applied for a loan of $225,000 from the Reconstruction Finance Corporation and after the rfc was assured that a special facilities contract would be given to plaintiff, if plaintiff could get a loan, the rfc approved one in the sum of $75,000, evidenced by a note dated February 4,1952. Plaintiff thereupon purchased the new plant and vacated its old one. An addi *701 tional loan of $150,000 on a note dated March 8, 1952, was obtained from the rfc for use as working capital. The first loan was secured by a mortgage on the real estate and the other by a mortgage on plaintiff’s equipment, machinery and other personal property. The loans are not referred to in the contract in issue discussed more fully hereafter.
5. After many conversations, plaintiff and the defendant, the latter acting through the Army Signal Corps, entered into a contract, No. DA-36-039-SC-26644, on February 11, 1952. The document is entitled “Special Facilities Contract.”
On May 8, 1951, the Signal Corps procurement agency in Philadelphia had written to plaintiff and supplied sample pages from an appendix a of a contract produced by another company participating in a special facilities contract. The sample was provided as a guide to plaintiff in preparation of its own appendix a which was to become part of the contract the parties expected to execute. Plaintiff was told that, if its appendix a was prepared basically as the sample provided, it would be relatively easy to consolidate the necessary figures and use them at a later date in the preparation of a list of subcontractors and suppliers. Plaintiff did make up a list which by the terms of the contract became a part thereof. It was entitled “Appendix ‘a’, Equipment Estimate for .015 Stainless Steel Program, Special Facilities Contract” and described equipment to be installed in plaintiff’s plant.
Article i-A-i-a provided as follows:
a. Delivery of the above “Facilities,” installed, will be in accordance with the following schedule:
(1) Acquisition, Construction or Rehabilitation of building ready for occupancy — start 6 February 1952
(2) Installation of equipment sufficient to begin pilot run production — start 6 March 1952
(3) Completion of installation — 1 May 1952
(4) Maximum production attained — 1 May 1952 at a maximum rate of 75,000 lbs. per month
The cost of the facilities, as set forth in the contract, was estimated to be $98,753.92. By supplemental agreement *702 dated March 24, 1953, the estimate was increased by $1,750.27 to $100,504.19.
6. A special facilities contract is a contract with an agency of the Government wherein equipment and machinery is bought and installed in a plant of a contractor to increase its productive capacity. The machinery is ordered, installed and paid for in the first instance by the contractor. When it has been inspected and approved by the agency and when actual payment by the contractor has been established, the contractor is reimbursed. When the equipment and machinery has been paid for by the Government by way of reimbursement, title to the same passes to and remains in the Government. The equipment and machinery are used in connection with the Government work of the agency involved and cannot be used for other Government work or for commercial work, unless there is express written authority to do so. On January 28, 1952, while the contract in issue here was being negotiated and before its execution, plaintiff requested that the contract should provide that plaintiff could use the Government-owned facilities in its commercial business, if Government work should be cut back. This request was refused and the contract was executed without any such provision.
7. Plaintiff contends the contract of February 11,1952, in issue here was a production contract and that it differed materially from similar contracts for special facilities. The contract did not refer to any prime contract. It stated, on page 1, in part:
whereas, there is in existence at this time certain executed supply contract (s) between the Government and the Contractor; and
whereas, the successful performance of said contract (s) requires the utilization of Government property and facilities; and
whereas, it is deemed by the Department of the Army; that the furnishing of said equipment and facilities, itemized in the schedule or schedules attached hereto and amendments thereof, will facilitate performance of said supply contracts and will aid the national defense;
now, therefore, it is mutually agreed, as follows: * * *
*703 The contract was prepared on a mimeographed form. The language above was not pertinent and should have been stricken. There was no supply or production contract between plaintiff and the defendant in February 1952 and no one had the authority to make such a commitment for the Signal Corps on .015 wire. Plaintiff did at this time, however, have purchase orders to produce .015 wire for prime contractors who had contracts with the Signal Corps to produce and supply spiral-four cable, as noted in finding 3. After execution of the contract of February 11,1952, plaintiff obtained additional orders to supply the component of .015 wire to the prime contractors. A trip report of a Government materials engineer who visited plaintiff’s plant on December 13, 1952, states that as of that date plaintiff had approximately $250,000 of unfilled military orders on hand, or about a five months’ backlog. The Signal Corps had no use for .015 wire as an end product. The Signal Corps never did contract with anyone to supply such wire directly to it and plaintiff did not supply wire to the Signal Corps under the contract here in issue. It is found that the reference in the contract to 75,000 pounds of wire per month refers to the maximum rate of production which could be attained by use of the added facilities. The reference in article m-A to production is likewise unrelated to any production to supply the Signal Corps direct. Special facilities contracts to obtain increased production were used ten times in the spiral-four program. The purpose was to increase production facilities of the wire companies so they could obtain subcontracts with the major cable companies which had prime contracts with the Signal Corps. It is stipulated that the mimeographed contract forms of five typical special facilities contracts examined by counsel are substantially the same in form and content as the one in issue here with the exception of additions to title v, headed “vw Gratuities” and “vx Examination of Becords,” which appear in the Wire Corporation contract and not in the others. The other contracts in the program were not available for examination. Plaintiff’s contract differs also in the names, amounts, dates and other terms typed into the blank spaces in the mimeographed form and in other provisions *704 not bearing on the issues here. The stipulation as to similarity of the special facilities contracts is part of the record in the case. It is found that while defendant’s use of the mimeographed form was inept in its use of language relating to supply contracts and production, the facts are that neither party had any misconception as to the meaning of the contract. When the intentions and actions of the parties are considered in the light of the case as a whole the weight of the credible evidence leaves no doubt but that the contract was not intended to be a production contract under which defendant would accept .015 wire from plaintiff. On the contrary, such wire to be produced by increased facilities was to be made available by plaintiff through the cooperation and coordination of defendant with prime contractors making spiral-four cable, of which .015 wire was one of several vital component parts. There was no price for the .015 wire provided in the contract in issue and no time or place specified for deliveries. These matters were between plaintiff and the prime contractors who bought the wire.
8. The installation completion date for facilities was extended to August 1953 by supplemental agreement. However, by August 21, 1952, the installation was substantially completed. The contract provided that title to the facilities should vest in the Government upon acquisition or installation in the contractor’s plant. Eeimbursement of costs was provided only upon approval or ratification of the same by the contracting officer. Article ii-e of the contract stated in material part:
2. Payments by Government. Upon inspection and acceptance in writing by the Contracting Officer, facilities, work and materials procured or manufactured by the Contractor hereunder and upon presentation of properly certified invoices or vouchers or other evidence of payment satisfactory to the Contracting Officer, the Contractor shall be reimbursed for the expenditures set forth in Title II hereof. * * *
9. Before plaintiff was reimbursed for the cost of facilities purchased by it and for installation costs, the equipment in question was inspected by a Signal Corps representative who also checked the documentary evidence to make sure it *705 had been paid for by plaintiff. If the equipment was satisfactory and the fact of payment was established it was approved and accepted, and the Signal Corps representative issued and signed a materials inspection and receiving report, called a mirr. Plaintiff attached a copy of the mirr to its voucher covering the particular equipment purchased and after being audited by the Army Audit Agency a check was issued to plaintiff in the amount called for and title to the facility passed to the defendant. While this was the customary way of handling reimbursement for expenditures made in purchasing and installing facilities listed in the appendix a of the contract, some exceptions were made because of complaints to the Signal Corps by suppliers of equipment who said that plaintiff was slow in its payments. To help plaintiff over this difficulty the Signal Corps sometimes paid plaintiff right after installation and inspection and in other instances made direct payment to the suppliers as the contracting officer had the discretion to do under, the language of article h-e-i of the contract.
10. The defendant was anxious for plaintiff to produce .015 wire for the prime contractors at a rate of 75,000 pounds per month by May 1, 1952, as indicated in the contract. Such a rate would have been necessary for plaintiff to meet its obligations to rfc. In April 1952 plaintiff had orders for approximately 800,000 pounds. However, plaintiff was having manufacturing difficulties in April and May. In April plaintiff shipped only 7,000 pounds of .015 wire and 11,000 pounds in May. Although plaintiff’s credit was not good, raw materials and labor were available to plaintiff, and the prime contractors needed the component to be supplied by plaintiff’s proposed production. The facts established, however, that plaintiff could not and never did produce at the expected rate and that plaintiff lacked the necessary equipment. Plaintiff, by trial and error, was able to overcome difficulties and produce wire which met the requirements of the spiral-four program, as did others with similar facilities contracts.
11. By June 1952 the prime contractors began to reduce orders for .015 wire such as produced by plaintiff. The turn of events in the Korean War had caused the spiral-four *706 cable program to be cut back and slowed down. Plaintiff’s production, therefore, was affected because of this situation and its delivery dates were extended by the prime contractors. The defendant wished plaintiff to stay in the picture and in July permitted plaintiff to use the facilities to make wire rope and aircraft cable, although at this time plaintiff had a backlog of unfilled orders for 150,000 pounds of .015 wire. By August the backlog had been reduced to approximately 60,000 pounds being shipped at a rate of 5,000 pounds per week although additional orders were expected to be received by plaintiff and the defendant thought the situation might change for the better. On August 22 defendant authorized plaintiff to use the Government facilities in plaintiff’s plant on contract work for the Navy, the Army Quartermaster Corps and the Atomic Energy Commission. By October 1952 orders were still falling off due to the Korean situation but plaintiff was given permission to fill orders for aircraft cable, stainless steel sponges and mine sweeper cable, which in no way related to the spiral-four program. It was apparent, however, that nonmilitary business would now be necessary to enable plaintiff to meet its Rue loan obligations and plaintiff made an application to use Government equipment for commercial business on a rental basis. Approval of the request was recommended by a Government inspector. In November 1952, when plaintiff’s plant productive capacity had reached 55,000 pounds per month and plaintiff had a four months’ backlog, the prime contractors had indicated no additional orders for .015 wire would be placed until after January 1953. In December 1952 plaintiff had unfilled orders for 77,000 pounds of .015 wire but unfilled military orders of all kinds in the equivalent of about a quarter of a million dollars worth of business or a five months’ backlog. By May 1958, however, the Signal Corps spiral-four program was cut back so that the productive capacity of special facilities producers was five times as large as existing orders.
Plaintiff’s plant was idle by this time because of lack of funds although plaintiff had a backlog of both Government and commercial orders. Plaintiff claims that defendant was obligated to see to it that plaintiff either had from defendant *707 or others enough orders to produce 75,000 pounds of .015 wire per month. As defendant did not place orders with plaintiff or other special facilities contractors and there is no evidence that anyone had any such authority to act for defendant in the spiral-four program and all production and sales arrangements were between plaintiff and prime contractors and no documentary evidence indicates defendant assumed or plaintiff asserted it assumed an obligation to give orders to plaintiff or provide any, the weight of credible evidence does not support plaintiff’s assertion.
Defendant did, however, make voluntary efforts to help plaintiff, as shown in these findings, by, among other things, helping to show plaintiff how and with whom it could get subcontracts, letting it do other Government business, permitting plaintiff to increase its commercial business by letting it use Government facilities in filling commercial orders and by helping plaintiff expedite payments to creditors.
12. On February 18,1953, plaintiff wrote to the contracting officer and stated that its present facilities, both Government-owned and corporation-owned, were not sufficient to produce a dollar volume to enable plaintiff to reach a financial breakeven point. A dollar volume of $75,000 per month was stated as necessary to meet financial obligations to the Government. As this would not permit accumulation of a reserve, a goal of $90,000 per month was stated, requiring additional equipment. Present equipment was stated as not efficient. The letter continued, in part:
In view of the extended delivery dates by most of our customers being the prime contractors on the spiral 4 program, we endeavored to survey the market in order to find if a demand existed for stainless steel wire. Our advertising and direct-mail inquiry resulted in many inquiries for large orders in all types of stainless steel.
At the time this survey was being planned we applied to the Signal Corps for permission to use Government owned facilities m the execution of other than Government contracts. To this writing we have not received any approval for the use of this equipment other than Government orders for the .015 stainless steel and a few smaller orders for which permission was received. The application made by us was on a rental arrangement whereby any and all orders could be manufactured without special permission on each and every contract.
*708 Defendant acknowledged and replied to this inquiry on February 20, 1958, and stated that, since the financial statement plaintiff had submitted indicated ». very unsatisfactory financial position, the Government would have to be assured of the continued operation of plaintiff’s plant. To this end the contracting officer requested submission by plaintiff of a plan by March 2, 1953, showing that if such a proposed lease of the facilities was entered into plaintiff would continue to operate. There is no evidence of what plan and assurances defendant received. However, on March 12,1953, plaintiff was authorized to use Government-furnished facilities under a rental arrangement on contracts other than those with the Government.
13. Plaintiff’s financial condition neverthless continued to deteriorate and the Signal Corps became concerned about the Government-owned facilities in plaintiff’s plant should bankruptcy ensue. There was the possibility that such facilities might get tied up in bankruptcy proceedings. In March 1953 there was no real need for the continuation of plaintiff in the .015 stainless steel wire program since there were other contractors who were financially able to carry on and who could supply spiral-four prime contractors with from four to six times as much stainless steel .015 wire as needed under the supply program at that time. Defendant’s representatives discussed the situation with representatives of plaintiff. Consideration was given to the Signal Corps rescinding permission given to plaintiff to use Government-owned facilities in commercial work. The plaintiff took the position that it had or could obtain a large volume of commercial contracts for which these facilities were necessary. The evidence does not establish that these were firm orders.
14. On March 5,1953, the reo wrote to the contracting officer that its experience in financing plaintiff was far from satisfactory due to inadequate production. Conferences were held by representatives of the Signal Corps and the kfo to determine the intent of kfc respecting the mortgages it held to secure loans to plaintiff. Plaintiff was slow in meeting its bills. Creditors complained to the Signal Corps. Approximately 100 of these creditors held a meet *709 ing. On June 2 the Washington office of the rfc authorized foreclosure of mortgages on plaintiff’s real estate and personal property. There was also a tax bill of $22,315 against plaintiff. On June 30, 1953, the rfo advised the Signal Corps of the impending foreclosure so that steps could be taken regarding the Government-owned facilities in plaintiff’s plant. On July 1, 1953, the Signal Corps terminated permission given to plaintiff to use Government-owned facilities to produce wire products for commercial customers. On July 15, 1953, the Signal Corps sent a telegram to plaintiff terminating the contract of February 11, 1952, under article iv-a. Notice of the termination was given to the rfc. Plaintiff’s president was familiar with the fact that Government contracts contain a provision authorizing the Government to terminate those contracts for its convenience and that this results in termination of subcontracts.
15. The Signal Corps served written notice upon plaintiff under article iv-a of the contract of intention to remove all of the Government-owned facilities from the plant and asked for a quotation on the cost of dismantling and preparing the facilities for removal. Plaintiff’s president replied on July 17,1953, stating that arrangements were being perfected with the rfc whereby the plant would be merged with another company. Plaintiff’s president made efforts to keep plaintiff in business but to no avail. Promises were made to comply with the request made under the contract by defendant for a quotation on the cost of dismantling and an estimate of $25,000 was given. Nothing, however, was done toward dismantling the Government-owned facilities although the requests for more specific information from plaintiff were repeated. Finally, plaintiff was petitioned into bankruptcy by its credtitors and the receiver would not let the facilities be removed until the Government established title thereto. Eventually this was accomplished on or about December 2, 1953. The Signal Corps had to hire a company to dismantle and ship the Government-owned facilities. Arrangements were made with the rfc to protect the facilities in plaintiff’s plant. The rfc established guards at the plant to protect its interests and those of the *710 Signal Corps. The cost of this protection was borne by the Signal Corps and is referred to hereafter in findings on damages.
DAMAGES
16. Provisions of the contract pertinent to the considerations of damages include the following:

Article I-A-H

The Contractor may, with the written approval of the Contracting Officer, substitute facilities similar to those in Appendix “A” or additional facilities thereto from time to. time as required during the course of the work; in which event Appendix “A” will be modified accordingly. Copies of all approved revisions or changes of said Appendix “A” shall be furnished the Contracting Officer so that, at all times, his copy of Appendix “A” will be current and include all approved modifications. A final revised Appendix “A” containing all modifications will be prepared by the Contractor upon completion of the work under Title I and upon final approval by the Contracting Officer will be appended to each of the signed copies of this Contract.- The final revised Appendix “A” shall be divided into “severable” and “nonseverable” facilities.

Article I-A-6

All purchase orders issued by the Contractor in excess of [$15,000] for the acquisition or manufacture of Appendix “A” facilities shall be subject to prior written approval of the Contracting Officer.
Article II — A—1
The Contractor shall be reimbursed, in the manner hereinafter provided, for such costs and expenditures as may be approved or ratified by the Contracting Officer. -The principles for determination of costs outlined in Part 2, Section XV of the Armed Services Procurement Eegulation in effect as of the date this Contract is executed shall be binding upon the Government and upon the Contractor and said principles are hereby incorporated by reference in and made a part of this Contract.
Article h-e-2 of the contract is-quoted in finding 8 and pertains to reimbursements to the contractor by the defendant upon inspection and acceptance in writing by the contracting officer of facilities, work and materials procured or manufactured by the contractor upon presentation of prop *711 erly certified invoices or vouchers or other evidence of payment satisfactory to the contracting officer.
Title v, definitions, of the contract provided as follows;
(b) The term “Contracting Officer” means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly designated Contracting Officer; and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority.
17. Plaintiff’s petition in exhibit a sets forth plaintiff’s alleged losses sustained in fulfillment of the contract here in dispute. These alleged losses, in twelve items, total $412,-131.98. Exhibit a to the petition sets forth five additional items described as nonreimbursed liabilities incurred in connection with the contract which total $362,322.57. The total of the seventeen items is $774,454.55 for which plaintiff prays judgment. Plaintiff filed a claim for substantially the same items with the Army Audit Agency in Boston on November 10,1953, and it was disallowed.
Pursuant to rule 28 (b) (2) the plaintiff submitted a schedule of the items and figures intended to be proved. This schedule, which is in evidence as plaintiff’s exhibit 10, cites the books and records upon which plaintiff relies to support its claimed damages. Defendant’s exhibit 33 is defendant’s schedule in reply thereto under the rule and made after an ebi audit of plaintiff’s schedules. The items of claimed damages will be considered in the following findings.
18. The first three items which constitute plaintiff’s alleged losses will be considered together as they relate to an alleged sale of 1,150 shares of preferred stock of Spencer Wire Company, Incorporated, West Brookfield plant, a Delaware corporation. These items are:
a. Loss on sale of 1,150 shares of preferred stock of Spencer Wire Go., Inc., West Brookfield plant_$55, 000. 00
b. Legal and audit fees in connection with sale of above securities_ 84, 859.15
c. Loss by guarantee because of assignment of proceeds of sale of above securities_ 25, 640. 85
115, 000. 00
*712 • The foregoing items are mentioned in plaintiff's general journal. The entries are not supported by any documents upon which they can be verified.
A general journal entry of October 31,1948, indicates that plaintiff sold assets of Spencer Wire Company, West Brook-field plant, plaintiff’s predecessor company, a Massachusetts corporation, to a new corporation, Spencer Wire Company, Inc., West Brookfield plant, a Delaware corporation, on August 19, 1948. Plaintiff’s name was changed in 1949. According to this entry these assets had a book value of $339,179.46. The sales agreement is not in evidence nor is any inventory of the assets in evidence. The assets were sold for a net sales price of $266,861.03. Plaintiff received, according to the general journal, $141,861.03 in cash and 1,250 shares of preferred stock in the new Delaware corporation. The stock was carried on plaintiff’s books at $125,000. These two amounts total $266,861.03. The $125,000 was carried in the asset account and was later reduced to $115,000 by reason of the transfer of 100 shares to a party for a commission. The balance of 1,150 shares was carried on the books at $100 per share. The general journal shows the sale of these shares in 1953 to Spencer Wire Company, Inc., Delaware, for $60,000 as part of an out-of-court settlement. The sales price was $55,000 less than the value of the stock as carried on plaintiff’s books and this latter sum is item one of plaintiff’s claim. Plaintiff contends this settlement was forced upon it by the rfc, but the ultimate decision thereon was plaintiff’s. Spencer apparently was paying no dividends and was dissipating corporate assets and thus depleting the value of plaintiff’s stock, hence plaintiff’s suit against Spencer.
Of the $60,000 plaintiff allegedly received, $25,640.85 was paid in cash and $34,359.15 was paid to plaintiff’s attorneys and accountants. This latter sum is item two of plaintiff’s claim. As with item one, plaintiff did not produce any documentary evidence to support these transactions other than entries in a general journal.
The $25,640.85 referred to above was turned over by plaintiff to the Deconstruction Finance Corporation to be held in escrow but was later applied by the rfc against loans *713 made to plaintiff. This is item three of plaintiff’s claim. This transfer is verified.
A certificate of condition of Spencer Wire Corporation filed with the Massachusetts Secretary of State shows that as of September 30, 1952, the liabilities of the corporation exceeded the assets by $175,045.88. On October 31, 1949, assets had exceeded liabilities by $234,682.91. The evidence does not establish a connection between the contract in suit and the alleged damage of $115,000 set forth in the first three items of plaintiff’s claim.
' 19. Item four of plaintiff’s claim is for “Loss in opening inventories of materials used in production” in the sum of $52,302.25. This figure is alleged to represent the value of materials on hand and available for production just prior to the facilities contract in issue. As of December 31, 1951, the plaintiff’s general ledger showed in the inventory accounts the following:
Inventory of raw materials___$16,451.35
Inventory of finished goods_!_ 10, 523.10
Inventory of shipping supplies_ 4, 500. 55
31, 475. 00
There is no credible evidence to support the item claimed and no supporting documents to the general ledger entries such as inventory sheets, bills, vouchers, bills of lading, or cancelled checks. There is no evidence of any approval by the contracting officer covering this item, or inspection or acceptance thereof, or satisfactory proof that the inventory was used in production under the contract, or what was in the inventory, or any evidence showing that this alleged loss was caused by defendant or was in any way connected with the facilities contract here in issue.
20. Item five of plaintiff’s claim is for “Loss in opening inventories of dies and tools used in production” in the sum of $19,065.82, a figure reflected in the general ledger as of December 31,1951, but otherwise unsupported by documentary evidence to establish its identity and value. There is evidence that there were purchases of dies in 1951 in the amount of $5,000 from MacDonald Metals, Inc., a corporation controlled by plaintiff’s president and majority stockholder. There is no evidence of payment or that this item *714 was ever inspected, accepted or ratified by the contracting officer or that it has any connection with the special facilities set forth in appendix a to the contract in suit.
21. Item six of plaintiff’s claim is for the sum of $20,267.76 representing alleged “Loss by assignment of opening value of machinery.” The item purports to represent the value of machinery and equipment on hand just prior to the special facilities contract in issue here. The balance in the general ledger machinery and equipment account as of December 81, 1951, was $22,306. The balance on the same date in the reserves for depreciation for machinery and equipment was $2,038.24, leaving a book value of machinery and equipment in the amount of the claim under item six. As in the case of all other items above, the claim here was unsupported by any invoices, bills of lading or other documentary records. The general ledger showed a purchase of machinery from MacDonald Metals, Inc., on September 1, 1951, for $10,000 but it was not supported by invoices or other documents. This item of the claim cannot be verified by the evidence and was never inspected, accepted or ratified by the contracting officer as a reimbursable item under the contract. The machinery was sold at auction as a result of plaintiff’s bankruptcy and whatever proceeds received were applied against the loan from the rito.
22. Item seven of plaintiff’s claim is for alleged “Loss by assignment of opening value of fixtures and equipment” in the sum of $2,858.98. The item purports to represent the value of plaintiff’s furniture and fixtures on hand and available for use just prior to the start of production under the contract. The general ledger accounts reflect a balance as of December 31, 1951, under office furniture and fixtures, of $3,586.67. The balance, under returns for depreciation, as of the same date, was $726.69, leaving a book value in the amount of $2,859.98, which is one dollar more than is claimed in plaintiff’s petition. There are no invoices or other records to support purchase of office furniture and fixtures during the period in question except $172.80 for Venetian blinds. There is no evidence this item of the plaintiff’s claim was ever inspected, accepted, approved or ratified by the contracting officer. These furnishings were *715 sold at auction by reason of plaintiff’s bankruptcy and proceeds applied to reduce the plaintiff’s debt to the nrc.
23. Item eight of plaintiff’s claim in the amount of $1,400 is for “Loss by assignment of opening value of motor vehicle.” This is not an item referred to by the contract and there is no showing of its inspection, acceptance, approval or ratification by the contracting officer. The item is claimed to represent the value of a motor vehicle on hand and available for use just prior to the start of production under the contract and its value is reflected in the general ledger. In the general ledger under date of September 80, 1951, the autos and trucks account is charged with $1,500 from the purchase book, which on September 1, 1951, states that a Mercury auto was purchased from MacDonald Metals for $1,500. Depreciation was taken through December 31, 1951, at the rate of 20 percent per year which is in accordance with good accounting practice and amounts to $100 for the period in question. The ledger entry was not supported by any documentary evidence upon which such entry could be verified. As in the case of items sis and seven there is evidence indicating the vehicle was covered by a chattel mortgage to the Rue, that it was sold and proceeds applied against the loan. What was received for it and so applied is not known.
24. Item nine of plaintiff’s claim is for $15,356.08 representing alleged “Unrecovered research and development costs in connection with development of non-magnetic wire.” This item does not appear on the books of the corporation. The individuals who are alleged to have carried on the experimentation and research work are Chas. E Reardon, William H. MacDonald and a Mr. Carlstrom. Plaintiff’s proof is that this alleged work was done largely in the first six months of 1951. There is no record of the time allocated to such work and plaintiff’s auditor testified that it is estimated. The time and materials expended on such alleged work are not established by the evidence. The contract in issue did not provide that plaintiff should do any research work for the Signal Corps. The facilities covered by the contract and mentioned in appendix a were not for research. There is no evidence that plaintiff was ever authorized to do such work for defendant or that the contracting *716 officer ever ratified any such work done. Plaintiff did, apparently, experience some difficulties in producing the .015 wire but worked them out prior to the date of the contract, as did other special facilities producers.
25. Item ten of plaintiff’s claim is for “Non-reimbursed invoices for U. S. Army equipment” in the sum of $27,709.04. This sum represents expenditures alleged to have been made by plaintiff under the contract, reflected by unpaid vouchers submitted for payment by plaintiff, and shown in the plaintiff’s purchase book for the months of March through August 1952. The contract as amended set the estimated cost of the facilities to be purchased and installed by plaintiff in plaintiff’s plant at $100,504.19. Notwithstanding warnings not to exceed this limit, plaintiff recorded expenditures of approximately $109,765.82, submitted vouchers to defendant totaling $102,806.78, and was paid $94,184.24 under the reimbursement provisions of the contract subject to final audit. The nonreimbursed balance between actual expenditures and amounts refunded is $15,581.08. Of this latter amount the evidence establishes that plaintiff has not paid out to creditors the sum of $6,038.98. Plaintiff produced no evidence that it had spent this sum for facilities under the contract. The balance of $9,542.10 is all of the $27,709.04 alleged in this item which is established by the evidence as paid out by plaintiff in performance of the contract. Vouchers which total the amount of item ten of plaintiff’s claim have not been presented by plaintiff. However, defendant admits that the sum of $5,377.08[1] remains unpaid on verified vouchers submitted by plaintiff which would leave $4,165.02 ($9,542.10 less $5,377.08) representing purchases and expenses incurred by paintiff. Of this amount $3,245.46 represents items for which plaintiff submitted vouchers but the defendant either disapproved or suspended payment. (See finding 37).
As to all of these outstanding sums, except the $5,377.08, there is no showing of approval by the contracting officer prior to their expenditure or ratification by him after expenditure, nor of inspection or acceptance in any form.
*717 26. Item eleven of plaintiff’s claim as set forth in the petition and schedule is for “Non-reimbursed overhead expenses in connection with installation and acquisition of U. S. Army-equipment,” in the sum of $20,000. Article h-a of the contract provides that the contractor shall be reimbursed, upon approval or ratification by the contracting officer for, among other things:
a. Cost of facilities procured from sources other than his own manufacture:
(1) The net invoice price thereof.
(2) The actual cost of transportation to the Contractor’s plant * * *
*****
d. Installation of facilities acquired or manufactured hereunder, when effected by servants, agents, or employees of the Contractor:
(1) The net invoice price of all direct materials required for installation.
(2) The actual cost of transportation to the Contractor’s plant of the required materials, * :i' *
(3) The cost of all direct labor required for installation.
(4) Allocable overhead and general and administrative expense.
f. For necessary plant rearrangement, rehabilitation and incidental construction including any necessary services required prior to installation of Appendix “A” facilities or Appendix “B” facilities:
(1) When effected by persons other than servants, agents or employees of the Contractor.
The net invoice price to the Contractor of rearrangement, rehabilitation and incidental construction.
(2) When effected by agents or employees of the Contractor.
(a) The net invoice price of all direct materials required for installation.
(b) The actual cost of transportation to the Contractor’s plant of the required materials, * * *
(c) The cost of all direct labor required for installation.
*718 (d) Allocable overhead and general and administrative expenses.
2. General. * * *
c. The Contractor hereby agrees to keep records and books of account, on a recognized cost accounting basis, showing the actual cost to it of all items of labor, materials, equipment, services and other expenditures of whatever nature for which reimbursement is authorized under the provisions of this Contract. The system of accounting to be employed by the Contractor shall be such as is satisfactory to the Contracting Officer. * * * Except such original and other documents as submitted in support or reimbursement vouchers, the Contractor will preserve at its own expense for a period of three years after completion or termination of this Contract all books, records and other papers herein mentioned.
Plaintiff did not manufacture any of the equipment listed in appendix a of the contract but purchased it from others. An auditor from the Army Audit Agency visited plaintiff’s plant in early March 1952 and advised the contractor of the requirements for preparing and submitting reimbursement vouchers. Plaintiff was advised that under the terms of the contract and under Government procedures such a voucher would have to be supported by original invoices for all materials claimed on the voucher and that direct labor for installation of the facilities would have to be accounted for separately and indirect labor would also have to be set up separately. Plaintiff was advised that overhead for items acquired in the open market was not allowable and that overhead for installation of facilities performed by other than production personnel would have to be accounted for in such a way as to make possible a proper allocation. As MacDonald Metals Company, another corporation, was occupying plaintiff’s plant at the time, plaintiff was cautioned to segregate costs of each. These conversations were with plaintiff’s auditor and plaintiff’s president.
27. On April 27,1953, plaintiff submitted voucher 9 in the amount of $12,331.06 for reimbursement of overhead expenses from February 1, 1952 through June 30, 1952. The voucher was returned for corrections and was not paid. It had claimed indirect labor costs and overhead on other than installation. Plaintiff submitted a new voucher 9, dated *719 September 4, 1952, in the amount of $4,601.47. This voucher was returned to plaintiff on November 17,1953, “for correction to reflect the actual applicable overhead expenses, general and administrative expenses, and direct labor reflected on the company’s books for the submitted period from 1 February to 30 June 1952.” The second voucher was not resubmitted but instead plaintiff submitted a third one, No. 13, for overhead in the amount of $20,000. This voucher was not supported and like the others was not paid. It is not supported now by the evidence in the case. During the course of the trial plaintiff conceded that the amount claimed should not exceed the amount set forth in the first voucher, namely, $12,331.06.
28. On November 28, 1952, plaintiff was advised by the Boston office of the Army Audit Agency by letter, that claims for reimbursement must be fully substantiated and that the indirect costs involved and the proration bases used should be subject to ready audit verification. Defendant desired that a statement be submitted showing the plaintiff’s accounting policies regarding the manner in which facility costs were accumulated and overhead rates were developed. Defendant sent plaintiff a copy of “Outline for Contractor’s Overhead Submission” in accordance with Army Audit Agency instructions, dated March 24, 1950, as a guide in preparation of the statement requested. Plaintiff was further informed as follows:
It is advised, that this office has no authority under existing directives to approve overhead claims under the above-referenced contract without the required statement of accounting policies and overhead statements discussed hereinbefore.
In the event that additional advice or assistance is required by your organization, arrangements will be made for a conference for such purpose upon receipt of specific request therefor.
There is no evidence establishing that plaintiff ever furnished to the defendant the statement required or asked for any further assistance respecting it. On March 10, 1954, after plaintiff had submitted its claim of November 10, 1953, plaintiff was advised by the Army Audit Agency that said office was without authority to take further action on *720 the claim and it was pointed out to plaintiff that the overhead claim of $20,000 was a duplication of the costs claimed under voucher 9, which was returned for correction to plaintiff and was never resubmitted to defendant.
29. An audit was made of plaintiff’s books and records to verify the alleged expenditures for overhead, but the records did not furnish a basis for determining the installation costs or overhead on the installation, because labor was not classified (all payroll having been entered in a single account) and because overhead was not segregated with respect to expenses applicable to the maintenance department which performed the direct labor under this facilities contract. Plaintiff’s auditor and president testified that the manner in which overhead expense was to be computed was not agreed upon by the parties or clarified. The weight of the credible evidence is to the contrary as indicated above. Defendant admits that plaintiff was entitled to overhead on the installation but the evidence submitted to the Army Audit Agency was insufficient to determine and verify it, as is the evidence in this case. No such item was ever approved or ratified by the contracting officer.
Plaintiff did not keep or submit to the Army Audit Agency, pbi or to the Commissioner documentary evidence such as plaintiff had been instructed to maintain to accomplish reimbursements under the contract.
A price analysis dated February 1, 1952, made for the contracting officer by the Signal Corps pricing section, contract service branch, in connection with the proposed contract which was made on February 11, contains an engineering estimate for costs likely to be incurred in connection with installation of the equipment that would normally be recovered by the application of overhead factors. In view of the small amount involved, namely $1,410, it was stated that the contractor had agreed to include it as a direct charge in the contract price and it was so included.
30. Item twelve of plaintiff’s claim is for $138,172.05 for “Production loss because of curtailment of U. S. Army Signal Corps requirements.” The figure above is based on plaintiff’s estimate that at a production rate of 75,000 pounds of .015 wire per month it would have a margin of 16 *721 cents per pound to meet its obligations and provide profit. From April 1952 to June 30, 1953, plaintiff claims it produced approximately 261,430 pounds. Plaintiff estimates that it should have produced 1,125,000 pounds at a rate of 75,000 pounds per month, a difference from actual production of 863,570 pounds. The latter figure multiplied by 16 cents results in a figure of $138,171.20, within less than a dollar of plaintiff’s claim under this item. Plaintiff’s auditor testified he arrived at this formula after consultation with a representative of defendant prior to execution of the contract. The representative of defendant denied it. Sales invoices necessary to check these poundage figures were not identified in plaintiff’s schedule, as required by the rules, and were not available for audit. There is no reference in the contract to any such item as claimed here. Plaintiff’s requested findings describe it both as a lost profit and a cost. There is no evidence of approval or ratification by the contracting officer of the item. It was not possible to verify the figure claimed because production and sales figures were not made available and there was no account set forth on the books in which this figure appears. There was no indication in plaintiff’s schedule of the period of time over which the item was being claimed. Working papers of plaintiff’s auditor were not available. As noted in finding 10, plaintiff was unable, during the period used by plaintiff for its computations under this item of its claim, to take full advantage of its considerable backlog of orders because of manufacturing difficulties and not because of its inability to get subcontracts. Its later reduction in volume was on account of the Korean situation.
31. The next five items of plaintiff’s claim are described as “Additional Non-Keimbursed Liabilities Incurred in Connection with U. S. Army Contract.” Item thirteen is for the balance due on the Reconstruction Finance Corporation loans stated in the sum of $188,109.15. It has been previously found there were two loans in the total amount of $225,000. Plaintiff paid $37,378.91 on the total, leaving a balance of $187,621.09. Assets of the plaintiff in bankruptcy were sold for $54,003.56 and after deducting expenses, including taxes, the sum of $42,127.11 was left and this was *722 applied to reduction of the debt to the rfc to a balance of $145,493.98. This item of the claim is not listed in the contract or appendix a as a reimbursable item and it was never considered at any time by the contracting officer. On the contrary, it remains an offset due the defendant against any sums due plaintiff, although defendant has not in this case sought to offset it by counterclaim or otherwise.
32. Item fourteen of plaintiff’s claim is for “Accounts payable — owed to creditors” in the amount of $132,299.89. Plaintiff computes this as the sum due creditors at the time the facilities contract was terminated on July 15, 1953. The accounts payable in plaintiff’s general ledger shows the last posting date to be August 31, 1953, and lists a figure of $111,523.74. However, in its bankruptcy proceedings plaintiff set forth the following under current liabilities:
Accounts payable_$102,198.43
Loans payable, MacDonald Metals, Inc_ 30,101.46
132,299.89
There were some late postings to accounts payable which increased that figure to $108,368.78. The accounts payable include the $6,038.98 referred to under item ten (finding 25) which, therefore, is a duplication.
With regard to the loans payable, MacDonald Metals, Inc., there was no loan account set forth in the general ledger showing the amount due. However, defendant’s auditors made an analysis of all transactions between the two corporations and determined that the cash received from MacDonald Metals was $86,137.49 and cash payments to MacDonald were $46,149.48 which left a balance due of $39,-988.01. However, there was an account receivable due from MacDonald in the amount of $33,211.57 which when offset against the payable item leaves a net balance due MacDonald Metals, Inc. of $6,776.44. These adjusted figures indicate that the total liabilities were $115,145.22 ($108,368.78 plus $6,776.44). The documents to make this verification were adequate. It is not established that the liabilities were incurred upon approval of the contracting officer. MacDonald Metals, Inc., acted as a sales agent for plaintiff.
33. Item fifteen of plaintiff’s claim is “Accrued federal and state taxes” in the amount of $28,857.36, allegedly owed *723 by plaintiff at the time the contract was terminated. The audit made under the rule of the court establishes as a fact that due to certain interest, penalties and liens the federal tax due is $34,816.49 and the state tax is $5,407.32 for a total of $40,223.81. The sums are for employer withholding taxes and old age benefit taxes. The taxes are included in the claim as an expense incurred by the Wire Corporation during performance of the facilities contract. There is no evidence that they are a reimbursable expense under the contract or approved as such at any time by the contracting officer.
34. Item sixteen of plaintiff’s claim is for “Accrued wages — unpaid wages of employees” in the amount of $6,202.62. The verified amount of unpaid wages is $6,101.04. According to plaintiff’s general ledger the accrued wages as of December 31, 1952, totaled $1,079.67 to which amount $5,021.37 was added between the period from January 1, 1953 to August 31, 1953. The evidence does not establish what part if any of this labor was for direct labor required for installation under the contract or is reimbursable thereunder, nor does it show application to or approval by the contracting officer. Plaintiff’s auditor testified that the wages weren’t all for installation but made no attempt to allocate them. The Signal Corps estimate in February 1952 was $1,873 for direct labor which was included in the contract price.
35. The seventeenth and final item in plaintiff’s claim is “Loans payable — C. E. Eeardon, and others” in the sum of $6,853.55. This figure is made up of two amounts, $3,853.55 owed to C. E. Eeardon and $3,000 owed to S. J. Eosenstein, as of September 1, 1953. Mr. Eeardon was an official of plaintiff corporation and advanced personal funds to it. The verified amount of plaintiff’s debt to him is $3,-812.08. This debt was incurred between January 1952 and April 1953. Eeardon made a claim in the bankruptcy proceedings.
Plaintiff’s general journal reflects that during February 1952 lands and buildings were purchased by plaintiff from S. J. Eosenstein and others at a cost of $80,000 and that $65,000 thereof was paid by the rfc and notes were given *724 to Eosenstein and others for the remaining $15,000. Plaintiff paid $12,000 on these notes, leaving a balance of $3,000 for which Eosenstein made a claim in the bankruptcy proceedings.
The evidence does not establish authorization by the contracting officer of loans to Eeardon or Eosenstein as reimbursable items under the facilities contract or that any vouchers were ever submitted for the same.
dependant’s counterclaim
36. Article ih-e-3 of the contract provided as follows:
Final Payment. Upon completion of the work pursuant to Title I and final acceptance thereof in writing by the Contracting Officer, the Government shall pay to the Contractor the unpaid balance of the cost of the work determined under Title II hereof, less any sum that may be necessary to settle any unsettled claims for labor or materials, or any claim in connection with this Contract which the Government may have against the Contractor. The Contracting Officer shall accept or reject the completed work with reasonable promptness. Prior to final payment and as to condition thereto, the Contractor shall furnish the Government with a release of all claims against the Government arising under and by virtue of this Contract other than such claims, if any, as may be specifically excepted by the Contractor from the operation of the release in stated amount to be set forth therein.
Article ni-H-5 of the contract provided as follows:
Except to the extent of any loss or destruction of or damage to Government-Furnished property for which the Contractor is relieved of liability under the foregoing provisions of this clause, and except for reasonable wear and tear or depreciation, or the utilization of the Government-Furnished property in accordance with the provisions of this Contract, the Government-Furnished property (other than property permitted to be sold) shall be returned to the Government in as good condition as when received by the Contractor in connection with this Contract.
Title v, plant protection, of the contract provided in part as follows:
The Contractor shall maintain in and about his plant adequate plant protective devices and shall employ such *725 ■watchmen, guards and other personnel as the Contracting Officer may deem necessary to prevent espionage, sabotage, and other malicious destruction or damage. If the Contracting Officer from time to time shall require the installation of plant protective devices or the employment of watchmen, guards or other personnel, or both, in addition to those deemed necessary by him on the date the Contractor shall commence performance of this contract, the cost of any such devices installed or the pay of any such personnel employed, or both,, at the written request and upon the written authorization of the Contracting Officer, shall be reimbursed to the Contractor upon submission of vouchers approved by the Contracting Officer, provided that no reimbursement of the cost of any such installation or pay of any such personnel, or both, shall be made in excess of the cost thereof, as estimated in advance and approved in writing by the Contracting Officer.
37. Item 1 of the counterdaim — $10$lfi31.
Plaintiff was paid on vouchers 1 to 8, inclusive, the sum of $94,184.24. These vouchers covered items of equipment and installation under appendix a of the contract. After payment of these vouchers the Army Audit Agency conducted a further audit of each voucher which had been submitted to it by the plaintiff. The reaudit of these eight vouchers resulted in the following costs being disapproved:
Voucher 1. $4,127. 50
Voucher 2. 41.56
Voucher 3. 103.11
Voucher 4. 65.72
Voucher 5. 9.25
Voucher 6. 7.15
Voucher 7. 17.91
Voucher 8.
4,372.20
This $4,372.20 has not been paid to or recovered by defendant. Plaintiff was unable to show Army Audit that it had made payment and was entitled to reimbursement.
A reaudit of these eight vouchers resulted in the following costs being suspended :
Voucher 2_$4,521.50
Voucher 3_ 55.94
Voucher 4_ 3, 868.91
Total. 8,446.35
*726 This $8,446.35 has not been recovered by defendant. The amounts were suspended on vouchers 2, 3 and 4 because the invoices were billed on a cost-plus-a-percentage-fee basis, that is, the cost of equipment which was purchased under appendix a was plus a percentage for overhead and profit. This was determined by defendant to be contrary to the provisions of the contract. There is no evidence, however, that plaintiff could have purchased this equipment at a lesser cost than it did nor is there evidence to show that plaintiff paid other than the fair and reasonable cost thereof.
Vouchers 10, 11 and 12 totaled $5,123.80. Defendant suspended $3,015.95 and disapproved $229.51 of the total. Suspensions were made because items were billed on a cost-plus-a-percentage-fee basis which defendant determined to be contrary to the provisions of the contract and because there was no showing that plaintiff had actually paid the amount claimed on these vouchers. Defendant concedes, however, that as the vouchers were not disallowed or suspended in full there remains due and owing to the plaintiff a balance of $1,878.34. The defendant adds the sums of $4,372.20 for costs disapproved on vouchers 1 through 8 and $8,446.35 on suspended costs on vouchers 2, 3 and 4, and from this total of $12,818.55 subtracts $1,878.34 admitted due on vouchers 10, 11 and 12 and claims a balance of $10,940.21.
The suspended costs on vouchers 2, 3, 4,10,11 and 12 total $11,462.30. It is established by the evidence that these suspended sums were for items of equipment listed in appendix a to the contract and would have been reimbursable had it not been for the manner of their billing. With respect to both these items where payment was either disapproved or suspended, defendant does not show that it failed to obtain possession of the equipment covered thereby when it removed the appendix a equipment from plaintiff’s plant. As to the $1,878.34 which defendant admits to be due on vouchers 10, 11 and 12, this sum is a part of the $5,377.08 defendant concedes plaintiff is due on vouchers 1 through 8 and 10, 11 and 12 as stated in finding 25. The sum of $5,377.08 deducted from $12,818.55 leaves a balance of $7,441.47, instead of the larger sum claimed by the defendant.
*727 38. Item 2 of the counterclaim — $2,707.03.
When the Signal Corps took possession of the Government-owned facilities to remove them from plaintiff’s plant following termination of the contract, it made an inventory of them. This inventory was checked against the inventory of the facilities and equipment installed in plaintiff’s plant under this contract. This check revealed that some items of equipment were missing, namely, 711 reels or spools that plaintiff acquired under this contract, a hoist and a tensile tester. The fair value of this missing equipment which the Signal Corps paid for was $2,907.03.[2] The defendant has not been reimbursed for any part of this amount.
39. Item 3 of the counterclaim — $6,895.
When the Signal Corps took possession of the Government-owned facilities to remove them from plaintiff’s plant, after' the contract had been terminated, it was found that some of the equipment was in a general rundown condition, dirty and caked with old oil and considerable rust. The wire drawing machines were caked with an accumulation of oil and wire scrapings. Before the machines could be used again elsewhere they would have to be thoroughly cleaned. The wire scrapings were abrasive in character and had a tendency to damage the bearings and other moving parts of the equipment. The leading furnace (a furnace for coating wire with lead) was rusted all over. The rod machine had been stored under unfavorable conditions and showed considerable dampness which affected the electrical equipment The damage to the machines and equipment was the result of poor maintenance and care and was beyond normal wear and tear. Defendant’s estimate of damage to this equipment beyond normal wear and. tear was $6,695. There is no evidence defendant complained to plaintiff about maintenance. This estimate is the only one in evidence and is reasonable.
The bankruptcy referee on November 12,1953, ordered all expenses of maintenance of the plant and machinery to be borne by plaintiff to December 2,1953, and ordered that $600 be deposited with the receiver for the purpose of defraying *728 the expenses but plaintiff did not comply with the order.
40. Item I of the counterclaim, — $JhOJ¡3.
After the defendant terminated plaintiff’s contract, the plaintiff took steps in the bankruptcy court to prevent removal of the Government-owned facilities and machinery furnished under this contract. Under arrangements with the rec, this property was protected by the rec, which maintained guards at the plant. The rec billed the Signal Corps for the proportionate share of the cost of these protective services in the amount of $4,048 and this amount was paid by the Signal Corps to the rec. The fair value of these services was $4,043. The defendant has not been reimbursed for this amount or any part thereof.
41. Item 5 of the cou/nterclaim — $8^816.49.
In its brief, defendant has requested permission to amend its counterclaim by adding a claim for Federal employer withholding taxes and old age benefit taxes due from plaintiff to the Federal Government during performance of the facilities contract and not paid.
At the time of termination, the parties to the contract were in dispute (Finding 33) as to their respective liabilities for various items under the contract, including these taxes, and those controversies have continued up to the present time. With respect to the taxes, the record does not disclose what part of the $34,816.49 claimed by the United States represents the principal amount of the taxes incurred by plaintiff during the performance of the contract and what part of that sum represents interest and penalties accruing later on such amount. Furthermore, the record does not indicate whether or not there has been assessment and demand by defendant on plaintiff for such taxes and, if so, the dates of such assessment and demand.
CONCLUSION OE LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that both plaintiff and defendant are entitled to recover, with the amount of the net judgment to be determined in further proceedings pursuant to Fule 38 (c).
*729 In. accordance with tbe opinion of tbe conrt and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on May 1, 1959, that judgment 'be entered for defendant on its counterclaim against plaintiff for $29,494.36.

 This figure is also treated in finding 37.

 Defendant’s counterclaim as stated In the pleadings is In error by understating Item 2 and overstating item 3 by $200. The error Is satisfactorily explained by the transcript and exhibits.